UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

GERALD MORGAN, )
)
Plaintiff, )
)
vs. ) Case No. 2:19cv02982
)
HITACHI VANTARA CORPORATION, )
et al., )
)
Defendants. )
)
-----------------------------

Deposition of GILBERT VILLEGAS

October 30, 2020

Dara C. Shuler, CSR No. 11249
467457

SINCE 1972

BARKLEY Court Reporters
barkley.com

(310) 207-8000 Los Angeles
(310) 207-8000 Century City
(916) 922-5777 Sacramento
(951) 686-0606 Riverside
(212) 808-8500 New York City
(312) 379-5566 Chicago
(415) 433-5777 San Francisco
(408) 885-0550 San Jose
(800) 222-1231 Martinez
(818) 702-0202 Woodland Hills
(347) 821-4611 Brooklyn
00+1+800 222 1231 Paris
(949) 955-0400 Irvine
(760) 322-2240 Palm Springs
(702) 366-0500 Las Vegas
(702) 366-0500 Henderson
(518) 490-1910 Albany
00+1+800 222 1231 Dubai
(858) 455-5444 San Diego
(800) 222-1231 Carlsbad
(800) 222-1231 Monterey
(516) 277-9494 Garden City
(914) 510-9110 White Plains
001+1+800 222 1231 Hong Kong

BY MS. WATSON:
Q But you did just state it's your recollection it was not a monitored email box, correct?
A Yeah, it's not a monitored email box. I just think it was just whoever would by chance take a look at the email box. Most of the time -- typically when we sent an email out of a shared mailbox like this, we would direct -- we would tell the employee or the audience, target audience, not to respond to this email box or to submit an inquiry through another avenue.
Q Do you recall ever yourself viewing the email box for HRglobalcompensationandbenefits-@hitachivantara.com?
A I don't recall reviewing the email box.
Q When you were preparing and signing your declaration, did you review the documents referenced in the declaration?
A Can you repeat that question again?
Q When you were preparing and executing the declaration, Exhibit 5, did you review at that time the documents that are referenced throughout the declaration, that are identified by Hitachi Bates stamp numbers?
A I believe I did.
Q Did you review any other documents outside of

Q Do you remember sending this email, as you sit here today?
A I remember sending this email. It was an action item that I was -- would take to inform the impacted parties of this change.
Q Did you say it's an action that you would take, or you do remember sending it?
A It was part of the -- part of the process for me to finish off the task at hand.
Q Do you have a recollection of actually sending it?
A It was long ago. I mean, I remember, but not in great, great detail.
Q Did you author it or just send it?
A I had authored it, and I had the benefits manager review.
Q And who was the benefits manager? I'm sorry.
A Then it's Susan Ramirez.
Q I cut you off. Were you going to say something else?
A No, I don't think I was going to say anything else.
Q Did you send it with a request for read receipts?
A I don't believe I did.

Q Did you have any other mechanism for the recipients to acknowledge receipt of this information?

MS. NIKKHAH: Objection; lacks foundation.

BY MS. WATSON:

Q You can answer.

A I don't -- I don't remember.

Q Please keep Exhibit 7 handy, but also if you could take a look at Exhibit 8.

(Deposition Exhibit 8 was marked by the reporter and is attached hereto.)

THE WITNESS: Okay.

BY MS. WATSON:

Q Exhibit 8 was an April 1, 2015 sales commission plan for my client, Gerald Morgan.

Was this the kind of document that you would work with in your traditional role, in your compensation role?

MS. NIKKHAH: Objection to the form of the question.

BY MS. WATSON:

Q You can answer.

A I'm familiar with -- from my experience in looking at this document, it's obviously a new format, so just based on my experience. But it is something that in my previous role, that this is a document we

Q You may answer.
A I don't recall Tom stating that to me.
Q In any event, you got in touch with Mr. Carroll.
And was it at that point in time that you realized that you had a flash drive with Hitachi documents on it?
A No, it wasn't.
MS. NIKKHAH: Objection to the form of the question.
BY MS. WATSON:
Q When did you realize that you had a flash drive with Hitachi documents on it?
A I believe it was the next day or two.
Q And how did that come to your attention?
A I was in the middle of trying to back up my laptop, my current laptop. And I was searching for a hard drive, an external hard drive, and I have multiple here. But it just does not have the space, and so as I was searching through one of the old hard drives, it's pretty difficult to kind of go through -- thought maybe I might have a copy of my old HDS email.
And that's how I stumbled into looking at -- I'd have to be able to open up Outlook to be able to see it. That's how I was able to come across some of

the emails that pertain to this subject.

Q But that thought that you might have had HDS emails didn't occur to you when you were speaking with Mr. Carroll with regard to your declaration earlier this year?

MS. NIKKHAH: Objection to the form of the question.

You can answer.

THE WITNESS: No. This hard drive, I don't look at. It's just been in the drawer, and I've actually had to purchase additional hard drives because of just the capacity. So I've had no reason to really access it.

BY MS. WATSON:

Q Okay. So I misspoke. It was a hard drive, not a flash drive?

A It's not a flash drive. It's a hard drive, external hard drive.

Q Were you allowed to have those documents when you left your employment with Hitachi?

MS. NIKKHAH: Objection; lacks foundation, objection to the form of the question.

MR. CARROLL: Join.

MS. NIKKHAH: You can answer.

THE WITNESS: I don't believe so.


BARKLEY Court Reporters

BY MS. WATSON:

Q Did you -- were you supposed to give all information that you had that belonged to Hitachi back?

MS. NIKKHAH: Same objections.

BY MS. WATSON:

Q Go ahead.

A Yes, I believe I was supposed to. My laptop at Hitachi had gotten stolen twice, so which is probably why -- the reason why I had a copy of my emails.

Q Did you intentionally keep Hitachi documents when you left your employment?

MS. NIKKHAH: Objection to the form of the question.

THE WITNESS: No.

BY MS. WATSON:

Q What was the scope of the Hitachi emails on the hard drive?

MS. NIKKHAH: Objection to the form of the question.

BY MS. WATSON:

Q Go ahead.

MS. NIKKHAH: You can answer if you understand.

THE WITNESS: In looking at what was in there,

Q And was your recommendation accepted?
A It was taken up to Susan Ramirez, who I believe then took it up to our former manager for approval.
Q Was it approved as recommended?
MS. NIKKHAH: Objection; lacks foundation.
THE WITNESS: I believe it was.
BY MS. WATSON:
Q And this email does not state that the benefit target compensation amount, 175,000, will continue from year to year, does it?
A In reviewing this, it does not state that.
Q To your knowledge, did any of these emails bounce back as undeliverable?
MS. NIKKHAH: Objection; lacks foundation.
THE WITNESS: No, I don't recall any bounce-back emails.
BY MS. WATSON:
Q But if they did, they would have bounced back to the global total rewards box, correct?
A I believe so.
Q So the 175,000 benefit target compensation amount applied to people with certain job titles at Hitachi Data Systems, correct?
A No. It applied to those who had specific job

codes tied to them.

Q If somebody was hired in one of those job codes after December 4th, 2012, how would they know about a benefit target compensation amount applied to them?

MR. CARROLL: Objection; foundation.

MS. NIKKHAH: Join.

THE WITNESS: I would not know.

BY MS. WATSON:

Q Do you know whether the information contained in this email was available anywhere else to employees?

A No, I don't.

Q And some people received a similar email indicating that they were going to have a benefit target compensation amount of 250,000; is that correct?

A Yes.

Q What was the difference in the jobs between the two pools of people?

A One was for sales managers -- or managers, and then this one was specifically for individual contributors.

Q What is an individual contributor?

MS. NIKKHAH: Objection; lacks foundation.

BY MS. WATSON:

Q Go ahead.